**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/2/10

-------------------------------------------------- X

**UNITED STATES of AMERICA ex rel.**
**EDMUND ROSNER,**

          **Plaintiff,**

    - against -

**WB/STELLAR IP OWNER, L.L.C.,**
**INDEPENDENCE PLAZA**
**ASSOCIATES, LLC,**
**INDEPENDENCE PLAZA, L.P.,**
**STELLAR MANAGEMENT,**
**LAURENCE GLUCK, AND THE CITY**
**OF NEW YORK**

          **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**06 Civ. 7115 (SAS)**

-------------------------------------------------- X

**UNITED STATES of AMERICA ex rel.**
**EDMUND ROSNER,**

          **Plaintiff,**

    - against -

**GLENN GARDENS ASSOCIATES,**
**L.P., AND THE CITY OF NEW YORK,**

          **Defendants.**

-------------------------------------------------- X

**06 Civ. 11440 (SAS)**

1

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Edmund Rosner brings these *qui tam* actions on behalf of the United States against WB/Stellar IP Owner, L.L.C., Independence Plaza Associates, LLC, Independence Plaza Associates, L.P., Stellar Management, Laurence Gluck (collectively, "IPN"), and the City of New York ("the City" or "NYC") and a separate action against Glenn Gardens Associates, L.P. ("GG") and the City (collectively, "defendants").  Rosner alleges violations of the False Claims Act ("FCA")[1] in connection with the receipt of federal housing assistance payments under section 8 of the United States Housing Act.[2]  IPN, GG, and the City now move to dismiss the Complaints under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that Rosner's complaints are jurisdictionally barred by section 3730(e)(4)(A) of the FCA, commonly known as the public disclosure bar. In addition, IPN seeks an award of attorneys' fees under 31 U.S.C. § 3730(d)(4). For the reasons that follow, IPN, GG, and the City's motions to dismiss are granted, and IPN's motion for attorneys' fees is denied.

---

[1]    *See* 31 U.S.C. §§ 3729-3733.

[2]    *See* 42 U.S.C. § 1437 *et seq.*

2

## II.   BACKGROUND[3]

### A.   The Alleged Fraud

Independence Plaza North and Glenn Gardens are Manhattan housing complexes constructed as part of New York's Mitchell-Lama Housing Program ("MLP") in the mid-1970s.[4]  MLP aims to provide affordable housing to low- and middle-income households by granting developers low-interest mortgage loans and property tax exemptions while regulating rents, profits, disposition of property, and tenant selection.[5]  Owners may buy a property out of MLP after twenty years by paying the balance of the property's mortgage.[6]  A property that exits MLP is no longer rent regulated through that program, though the property

---

[3]   The allegations in this section are drawn from the First Amended Complaint against IPN and the City ("IPN Compl.") and the Second Amended Complaint against GG and the City ("GG Compl.") and are presumed true for purposes of this motion only.  Additional jurisdictional facts have been incorporated from the parties' declarations in support of and in opposition to this motion.

[4]   *See* IPN Compl. ¶¶ 12, 31; GG Compl. ¶ 12.  Independence Plaza was constructed in 1974.  *See* 4/19/10 Declaration of Stephen B. Meister, counsel for IPN, in Support of IPN's Motion to Dismiss ("Meister Decl.") ¶ 4.  Glenn Gardens was constructed in 1976.  *See* GG Compl. ¶ 12.

[5]   *See* GG Compl. ¶ 22.

[6]   *See* IPN Compl. ¶ 26.

may be subject to rent regulation under other New York laws.[7]  Glenn Gardens

exited MLP on June 27, 2003,[8] while Independence Plaza exited on June 28,

2004.[9]

   In addition to participating in MLP, Independence Plaza and Glenn

Gardens each received a New York City tax benefit known as a "J-51"

abatement.[10]  To qualify for a J-51 abatement, the subject property must be rent

regulated under one of several regulatory schemes, including MLP, for as long as

the abatement is in place.[11]  Although Independence Plaza and Glenn Gardens

each received a J-51 abatement following their exits from MLP,[12] neither complex

has been rent regulated since leaving MLP.[13]

   When Independence Plaza and Glenn Gardens exited MLP, tenants

eligible for section 8 housing assistance from the Department of Housing and

---

[7]  *See* GG Compl. ¶ 42.

[8]  *See id.* ¶ 30.

[9]  *See* IPN Compl. ¶ 33.

[10]  *See id.* ¶ 32; GG Compl. ¶ 29.

[11]  *See id.* at 6.

[12]  *See* IPN Compl. ¶ 32; GG Compl. ¶ 29.

[13]  *See* IPN Compl. ¶ 39; GG Compl. ¶ 36.

4

Urban Development ("HUD") were able to apply for section 8 Enhanced

Vouchers.[14]  Enhanced Vouchers cover the difference between a tenant's rent

contribution, as calculated under section 8 rules, and the fair market rental value of

the property.[15]  If a property is rent regulated, however, Enhanced Vouchers are

calculated on the basis of the regulated rent, not the fair market value.[16]  Vouchers

at both Independence Plaza and Glenn Gardens have been calculated based on

market rents since the complexes' exits from MLP.[17]

On March 23, 2006, the Department of Housing Preservation and

Development of the City of New York ("HPD") sent a letter to the New York City

Department of Finance ("DOF") notifying DOF that Independence Plaza's J-51

abatement was still in place.[18]  In its letter, HPD stated that it had determined that

the J-51 should have been terminated upon the complex's exit from MLP in

2004,[19] HPD requested that DOF retroactively terminate the the J-51 abatement as of

---

[14]     *See* IPN Compl. ¶¶ 36-37; GG Compl. ¶¶ 33-34.

[15]     *See* GG Compl. ¶¶ 19, 21.

[16]     *See id.* ¶ 21.

[17]     *See* IPN Compl. ¶ 39; GG Compl. ¶ 36.

[18]     *See* Letter of Julie C. Walpert, Deputy Commissioner, HPD, to Rose Horton, DOF, Ex. F to Meister Decl.

[19]     *See id.*

Independence Plaza's exit from MLP on June 28, 2004.[20]  On April 3, 2006, IPN refunded to DOF the tax abatements received after June 28, 2004.[21]  GG refunded its abatements on March 14, 2008,[22] and HPD retroactively terminated Glenn Gardens's J-51 abatement on March 26, 2008.[23]

Rosner, a tenant at Independence Plaza and a vice-president of the Independence Plaza North Tenants Association ("IPNTA"), alleges that because Independence Plaza and Glenn Gardens continued to receive J-51 abatements following their exits from MLP, the complexes are subject to New York's rent stabilization laws.[24]  However, both complexes have been receiving Enhanced Vouchers for the fair market rental value, rather than the rent stabilized value, of their section 8 units.[25]  Based on this set of facts, Rosner alleges that Independence Plaza and Glenn Gardens separately violated section 3729 of the FCA by (1) knowingly submitting false claims for payment to HUD, (2) knowingly submitting

---

[20]    *See id.*

[21]    *See* IPN Compl. ¶ 47.

[22]    *See* 4/19/10 Declaration of Sherwood Guernsey, counsel to GG, in Support of GG's Motion to Dismiss ("Guernsey Decl.") ¶ 7.

[23]    *See* GG Compl. ¶ 45.

[24]    *See id.* ¶¶ 12-13, 34; GG Compl. ¶¶ 12, 31.

[25]    *See* IPN Compl. ¶ 39; GG Compl. ¶ 36.

false records in support of false claims to HUD, and (3) conspiring to defraud the government by getting the false claims paid.[26]  Rosner further charges that the City was a knowing participant in both the IPN and GG schemes.[27]

On September 15, 2006, Rosner filed under seal a *qui tam* Complaint against IPN and the City of New York.[28]  On October 27, 2006, Rosner filed under seal a substantively identical *qui tam* Complaint against GG and the City.[29]  The Complaints were unsealed in October 2009,[30] and in March 2010, Rosner filed a First Amended Complaint against IPN and the City[31] and a Second Amended Complaint against GG and the City.[32]  All defendants moved to dismiss for lack of subject matter jurisdiction, and IPN additionally seeks attorneys' fees under 31 U.S.C. § 3730(d)(4).[33]

---

[26]     *See* IPN Compl. ¶ 60; GG Compl. ¶ 57.

[27]     *See* IPN Compl. ¶ 42; GG Compl. ¶ 39.

[28]     *See* Docket No. 2 in 06 Civ. 7115 (Sept. 15, 2006).

[29]     *See* Docket No. 2 in 06 Civ. 11440 (Oct. 27, 2006).

[30]     *See* Docket No. 13 in 06 Civ. 7115 (Oct. 30, 2009); Docket No. 8 in 06 Civ. 11440 (Oct. 30, 2009).

[31]     *See* Docket No. 24 in 06 Civ. 7115 (Mar. 24, 2010).

[32]     *See* Docket No. 23 in 06 Civ. 11440 (Mar. 11, 2010).

[33]     IPN also moved to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure and for failure to plead fraud with

**B.    Jurisdictional Facts**

Prior to the filing of Rosner's *qui tam* actions in 2006, information on

Independence Plaza and Glenn Gardens and the circumstances surrounding their

exits from MLP was available through a number of channels – including state

court civil actions, the DOF website, a New York City Comptroller's report, and

the news media. *First*, in March, 2006, tenants at Independence Plaza, including

Rosner, filed an amended complaint against IPN in the New York State Supreme

Court alleging, among other things, that (1) Independence Plaza was still receiving

a J-51 abatement and (2) that the complex was currently subject to rent

stabilization due to the J-51 abatement.[34]  These two allegations are also pled in a

December, 2005 state action against IPN, *Denza v. Independence Plaza*

*Associates, LLC*,[35] which seeks a declaratory judgment that Independence Plaza is

---

particularity under Rule 9(b).  *See* IPN's Motion to Dismiss.  Because I find that
this court lacks subject matter jurisdiction over the IPN action, I do not reach
IPN's alternative grounds for dismissal.

[34]      *See* Proposed Third Amended Complaint in *Independence Plaza
North Tenants' Assoc. v. Independence Plaza Assocs., LLC*, No. 113831/04 (Sup.
Ct. N.Y. County, filed Mar., 2006) ("IPNTA Am. Compl."), Ex. C to Meister Decl.
¶¶ 37-40.

[35]      *See* No. 117673/05 (Sup. Ct. N.Y. County, filed Dec. 21, 2005).

8

subject to rent stabilization.[36]

      *Second*, DOF maintains a searchable database of tax information for all properties in New York City that includes J-51 status and history.[37] The J-51 history of both Independence Plaza and Glenn Gardens was in this database prior to the filing of Rosner's initial actions in 2006.[38]

      *Third*, Independence Plaza and Glenn Gardens's exits from MLP were reported in a New York City Comptroller's Report published in February 2004.[39] The Report includes a map that highlights Manhattan properties that either had exited or were about to exit MLP.[40] Independence Plaza and Glenn Gardens

---

[36]    *See* Verified Complaint in *Denza*, No. 117673/05 ("Denza Compl."), Ex. B to Meister Decl. ¶¶ 4-5.

[37]    *See* DOF, J-51 Benefit History Request Screen, http://webapps.nyc.gov:8084/cics/cwba/dfhwbtta/abhq. To find a property's block and lot number, see DOF, Property Address Search, http://webapps.nyc.gov:8084/CICS/fin1/find001I.

[38]    *See* Independence Plaza North J-51 Benefit History ("IPN J-51 History"), Ex. E to Meister Decl.; Glenn Gardens J-51 Benefit History ("GG J-51 History"), Ex. E to Guernsey Decl.

[39]    *See* Comptroller's Report ("Compt. Report"), Ex. C to 4/19/10 Declaration of Stephen Kitzinger, counsel to NYC, in Support of NYC's Motions to Dismiss ("Kitzinger Decl.").

[40]    *See id.*

appear on the map.[41]

*Fourth*, Independence Plaza's exit from MLP and its tenants'
eligibility for section 8 Enhanced Vouchers was reported in *The New York Times*
on March 5, 2004,[42] in *The Villager* during the week of March 17-23, 2004,[43] and
in the *Downtown Express* in the weeks of March 19-25 and June 11-17, 2004.[44]
Glenn Gardens's exit from MLP and its tenants' eligibility for Enhanced Vouchers
was reported in an article, "Another Mitchell-Lama Building Hits the Market,"
published in the *West Side Spirit* on February 21, 2002, and reprinted in the
*Chelsea Clinton News* on February 27, 2002.[45]

*Fifth*, a *Downtown Express* article from the week of August 5-11,
2006, reported that Independence Plaza was receiving a J-51 abatement and that

---

[41]     *See id.*

[42]     *See Deal Would Limit Increases in Rent at a TriBeCa Complex*
("NYT Article"), Ex. K to Meister Decl. at 1.

[43]     *See I.P.N. Deal Gives Reason for Hope* ("Villager Article"), Ex. K to
Meister Decl. at 3.

[44]     *See Ink Dries as I.P.N. Rent Deal Is Signed* ("DE Article I"), Ex. K to
Meister Decl. at 6; *A Few I.P.N. Tenants Raise Objections to Rent Deal* ("DE
Article II"), Ex. K to Meister Decl. at 9.

[45]     *See Another Mitchell-Lama Building Hits the Market* ("Smith
Articles"), Exs. A, B to Kitzinger Decl.

this abatement could make the complex subject to rent stabilization.[46]

   *Sixth*, at some point during discovery in the *Denza* litigation,  HPD produced its May 23, 2006 letter regarding retroactive termination of Independence Plaza's J-51 status.[47]  Although the exact date of production is unclear, the IPNTA had the letter sometime before June 13, 2006, when they referenced it in a "J-51 Litigation Update" on their website.[48]

## III. LEGAL STANDARD

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

   Under Federal Rule of Civil Procedure Rule 12(b)(1), a party may assert by motion the defense that the court lacks subject matter jurisdiction to hear a claim.  Federal courts are courts of limited jurisdiction and may not entertain matters over which they do not have subject matter jurisdiction.[49]  "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance

---

[46] *See Owner Must Offer Better Rent Deal, I.P.N. Leaders Say* ("DE Article III"), Ex. K to Meister Decl. at 11-12.

[47] *See* Meister Decl. ¶ 16.

[48] *See* J-51 Litigation Update, Ex. L to Meister Decl. at 4-7.

[49] *See Wynn v. AC Rochester*, 273 F.3d 153, 157 (2d Cir. 2001).

of the evidence that it exists."[50]

In considering a motion to dismiss for lack of subject matter jurisdiction, the court must assume the truth of the material factual allegations contained in a complaint.[51]  However, "'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"[52]  "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court [ ] may refer to evidence outside the pleadings,"[53] such as sworn affidavits, correspondence between the parties, contracts, and other relevant documents.

## B.    The Public Disclosure Bar to *Qui Tam* Actions

The FCA authorizes private *qui tam* relators to sue in federal court on behalf of the United States "to recover from persons who make false or fraudulent

---

[50]      *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002)).

[51]      *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted).

[52]      *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

[53]      *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).

claims for payment to the United States."[54]  However, section 3730(e)(4) of the

FCA bars federal court jurisdiction in *qui tam* actions "when the relevant

information has already entered the public domain through certain channels."[55]

Specifically,

> No court shall have jurisdiction over an action under [section
> 3730] based upon the public disclosure of allegations or
> transactions [1] in a criminal, civil, or administrative hearing, [2]
> in a congressional, administrative, or Government Accounting
> Office report, audit, or investigation, or [3] from the news media,
> unless the action is brought by the Attorney General or the person
> bringing the action is an original source of the information.[56]

"[I]n order for the FCA's jurisdictional bar to apply, there must be

'public disclosure' of the information on which the allegation of fraud rests, and

this 'public disclosure' must occur through one of the sources enumerated in the

statute."[57]  Further, the public disclosure must contain the material elements of the

---

[54]     *Graham County Soil & Water Conservation Dist. v. United States ex
rel. Wilson*, 130 S. Ct. 1396, 1400 (2010).

[55]     *Id.* at 1401.

[56]     *Id.* at 1401-02 (dividing section 3730(e)(4)(A) into three categories).
Congress has amended section 3730(e)(4) since this suit was filed. *See* The
Patient Protection and Affordable Care Act, Pub. L. 111-148, § 10104(j)(2), 124
Stat. 119 (2010).  However, in *Graham* the Supreme Court held that these
amendments do not apply retroactively to cases pending at the time of the
amendments. *See Graham*, 130 S. Ct. at 1400 n.1.

[57]     *United States ex rel. Kirk v. Schindler Elevator Corp. (Kirk II)*, 601
F.3d 94, 103 (2d Cir. 2010) (citations omitted).

13

"allegations or transactions on which the claim is based."[58]  Public disclosure

occurs even if the information is not "widely disseminated,"[59] and even if a relator

did not obtain the information underlying his allegations solely from the publicly

disclosed material.[60]

　　　　If the "allegations or transactions at issue were publicly disclosed

through an enumerated source, a *qui tam* plaintiff may avoid dismissal under the

jurisdictional bar by establishing that she was an 'original source' of the relevant

information."[61]  Section 3730(e)(4)(B) defines an "original source" as "an

individual who has direct and independent knowledge of the information on which

the allegations are based and has voluntarily provided the information to the

---

[58]　　*Id.* (citing *United States ex rel. Fowler v. Caremark Rx, L.L.C.*, 496 F.3d 730, 736 (7th Cir. 2007) (stating that "A public disclosure exists under § 3730(e)(4)(A) when the critical elements *exposing the transaction as fraudulent* are placed in the public domain.") (quotation marks omitted and emphasis added), *overruled on other grounds by Glaser v. Wound Care Counsultants*, 570 F.3d 907 (7th Cir. 2009)).

[59]　　*United States, ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 323 (2d Cir. 1992). *Accord Kirk II*, 601 F.3d at 104.

[60]　　*See United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993).

[61]　　*Kirk II*, 601 F.3d at 103 (citing *Kreindler*, 985 F.2d at 1158-59).

14

Government before filing an action . . . based on the information."[62]

The Second Circuit has repeatedly held that "a *qui tam* plaintiff does not [have direct and independent knowledge] if a third party is the source of the core information upon which the *qui tam* complaint is based."[63] Neither "background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation,"[64] nor "collateral research and investigations"[65] suffice to turn a relator into an original source.

---

[62]     In the past the Second Circuit has imposed a third requirement on the original source exception:  the relator must have "directly or indirectly been a source to the entity that publicly disclosed the allegations on which the suit is based." *Kreindler*, 985 F.2d at 1159.  The continued validity of this third requirement is in doubt following the Supreme Court's decision in *Rockwell International Corp. v. United States*, which held that "the phrase 'information on which the allegations are based' refers to the relator's allegations and not the publicly disclosed allegations."  549 U.S. 457, 473 (2007) (quoting 31 U.S.C. § 3730(e)(4)(B)).  However, because Rosner does not satisfy the "direct and independent knowledge" requirement of the original source exception, I need not reach the question of whether he is also the source of the information on which the publicly disclosed allegations are based and therefore express no view as to the continued validity of this requirement.

[63]     *United States v. New York Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (quotation marks omitted).  *Accord Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995); *Kreindler*, 985 F.2d at 1159.

[64]     *United States ex rel. Feldman v. Van Gorp*, 674 F. Supp. 2d 475, 482 (S.D.N.Y. 2009) (quotation marks and citation omitted).

[65]     *Kreindler*, 985 F.3d at 1159.

## C.   Attorneys' Fees Under Section 3730(d)(4)

Section 3730(d)(4) of the FCA permits an award of "reasonable

attorneys' fees and expenses if the defendant prevails in the action and the court

finds that the claim of the person bringing the action was clearly frivolous, clearly

vexatious, or brought primarily for purposes of harassment." "Any one of these

three conditions is sufficient for an award of attorneys' fees."[66] A defendant need

not demonstrate bad faith in order to receive attorneys' fees under section

3730(d)(4).[67] In the Second Circuit, "[a] claim is frivolous when, viewed

objectively, it may be said to have no reasonable chance of success, and present no

valid argument to modify present law."[68]

## IV.   DISCUSSION

### A.   Public Disclosure

Defendants argue that the material facts on which Rosner's fraud

allegations are based were publicly disclosed through enumerated sources prior to

---

[66]   *Mikes v. Straus*, 274 F.3d 687, 704-05 (2d Cir. 2001).

[67]   *Id.* at 705.

[68]   *Id.*

16

the start of this action.[69]  Rosner counters that many of the sources on which the

defendants rely are not "public disclosures," because they do not fall within any of

section 3730(e)(4)(A)'s enumerated categories.[70]  Rosner further argues that his

allegations are not "based upon" any of the sources that qualify as section

3730(e)(4)(A) disclosures, because the sources do not contain the material

elements of the Complaints' allegations of fraud.[71]  As the IPN and GG actions

---

[69]     *See* IPN Memorandum of Law in Support of IPN's Motion to Dismiss
("IPN Mem.") at 4; GG Memorandum of Law in Support of GG's Motion to
Dismiss ("GG Mem.") at 17-18; NYC Memorandum of Law in Support of NYC's
Motion to Dismiss the Complaint Against NYC & GG ("NYC GG Mem.") at 2;
NYC Memorandum of Law in Support of Motion to Dismiss Against NYC & IPN
("NYC IPN Mem.") at 2.

[70]     *See* Rosner's Memorandum in Opposition to Defendants' Motions to
Dismiss ("Rosner Mem.") at 20-24.  Rosner further argues that some sources
should be excluded because they either pre-date the alleged start of the frauds –
i.e., the complexes' actual exits from MLP – or they post-date the filing of
Rosner's initial *qui tam* actions. *See id.* at 18-19.  Rosner cites no cases to support
his argument on "pre-dated" sources, nor does he explain why the fact that an
enumerated source disclosed an element of the alleged fraud before the fraud
actually commenced should matter, so long as the disclosed element is ultimately a
material element of the allegations. *See id.* at 18.  Moreover, the information in
IPN's pre-dated disclosures is duplicated in the *Downtown Express* article from
2005, after Independence Plaza's MLP exit date.  *See* DE Article III.  And part of
the information disclosed in GG's pre-dated disclosures appears in the
Comptroller's Report from 2004, after Glenn Gardens's exit date. *See* Compt.
Report.  I do not consider Rosner's "post-dated" argument because Rosner does
not identify any "post-dated" sources material to his allegations of fraud.

[71]     *See* Rosner Mem. at 25-30.

involve somewhat different disclosures, I address them separately.

### 1.     The IPN Action

The following information relevant to Rosner's fraud allegations against IPN and the City had entered the public domain in some fashion by the time Rosner filed his initial *qui tam* complaint against IPN and the City: (1) Independence Plaza exited MLP in June 2004, (2) Independence Plaza received a J-51 tax abatement after June 2004, (3) Independence Plaza received section 8 Enhanced Vouchers based on market rental value after exiting MLP, and (4) the City retroactively terminated Independence Plaza's J-51 abatement as of its exit from MLP.[72]  As "public disclosure" occurs when the relevant information is "placed in the public domain,"[73] this information publicly was disclosed for the purposes of the public disclosure bar.

Further, this information was disclosed through the *IPNTA* and *Denza* civil suits, the Comptroller's Report, *The New York Times*, *The Villager*, and/or

---

[72]     *See* DE Article III; Meister Decl. ¶ 16.

[73]     *United States ex rel. Kirk v. Schindler Elevator Corp. (Kirk I)*, 606 F. Supp. 2d 448, 460 (S.D.N.Y. 2009), *vacated on other grounds*, *Kirk II*, 601 F.3d 94.

the *Downtown Express*.[74]  As these sources indisputably fall within the categories

enumerated by section 3730(e)(4)(A), the disclosures became public through

enumerated sources.

Finally, the public disclosures contain the "critical elements of the

alleged fraudulent transaction."[75]  Rosner's allegation of fraud is essentially a two-

step inference.  *First*, because IPN received a J-51 abatement after 2004, it should

not also have been receiving Enhanced Vouchers based on market rents.[76]  *Second*,

because IPN and the City should have known about the J-51 abatement and its

import, IPN's claims to HUD must have been fraudulent.[77]  This inference is the

centerpiece for all of Rosner's fraud allegations.  The inference relies heavily, if

not exclusively, on the publicly disclosed information described above, making

---

[74]     *See* INPTA Compl. ¶¶ 37-40; Denza Compl. ¶¶ 4-5; Compt. Report;
NYT Article; Villager Article; DE Article I; DE Article II; DE Article III; Meister
Decl. ¶ 16.

[75]     *Kirk I*, 606 F. Supp. 2d at 462.  *Accord United States ex rel.
Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*, No. 00 Civ. 6593,
2004 WL 74310, at *3 (S.D.N.Y. Jan. 15, 2004) ("Put in words . . . a qui tam
action is barred where there is enough information in the public domain to expose
the fraud.").

[76]     *See* IPN Compl. ¶¶ 31-39.

[77]     *See id.* ¶¶ 40-42.

that information material to the alleged fraudulent transaction.[78]  Because the

material elements of Rosner's allegations were publicly disclosed through multiple

enumerated sources prior to the filing of Rosner's initial *qui tam* complaint, the

public disclosure bar applies to Rosner's action against IPN and the City.

### 2.    The GG Action

Information regarding Glenn Gardens's exit from MLP and its

tenants' eligibility for Enhanced Vouchers based on market rents was also publicly

disclosed through enumerated sources – namely, the Comptroller's Report and the

article appearing in *West Side Spirit* and the *Chelsea Clinton News* – prior to

Rosner's *qui tam* action against GG and the City.[79]  The primary difference

between the IPN and GG actions, however, is that Glenn Gardens's J-51 status,

while readily available in the searchable J-51 database on the DOF website,[80] was

not disclosed through civil ligation or in the news media.  And whereas the J-51

---

[78]     *See Kirk I*, 606 F. Supp. 2d at 462-63 ("The 'critical elements' of
Kirk's claim are: (1) Schindler obtained contracts (2) requiring an express
certification pursuant to 48 C.F.R. § 52.222-38 that Schindler had filed VETS-100
reports, and (3) Schindler had not actually filed those reports. . . . [E]ach element
of Kirk's claim was in the public domain, and accordingly, the 'allegations or
transactions' underlying this action had been publicly disclosed.").

[79]     *See* Compt. Report; Smith Articles.

[80]     *See* GG J-51 History.

database reveals that Glenn Gardens's J-51 status was in the public domain, the database may not be an "administrative report," under section 3730(e)(4)(A). If the database is not an administrative report, then Glenn Gardens's J-51 status was not disclosed through an enumerated source.[81]

No court within the Second Circuit has ruled on whether a database available on a government website is an administrative report.[82] In *United States ex rel. Kirk v. Schindler Elevator Corp. (Kirk II)*, the Second Circuit declined to consider whether a database was an enumerated source, finding that defendants had waived the issue.[83] The court suggested, however, that if it had further information concerning the "nature" and "availability" of the database, it would have considered such information in evaluating whether the database was an enumerated source.[84]

Though the Second Circuit expressed no opinion on the status of

---

[81]    If the J-51 database is an enumerated source, it could only fall under the heading of "administrative report," as the database is clearly not a hearing, audit, investigation, or piece of news media.

[82]    Indeed, no court in this circuit has ruled on whether any type of website is an enumerated source.

[83]    *See Kirk II*, 601 F.3d at 111 n.10.

[84]    *See id.* ("Given that there is nothing in the record indicating what the nature of this database is or to whom it is available, we are not in a position to evaluate [defendant's] argument.").

21

databases under the public disclosure bar, *Kirk II* does indicate that the Second

Circuit takes a narrower view of which sources are administrative reports than

several other circuits.[85]  *Kirk II* held that information produced in response to a

Freedom of Information Act ("FOIA") request "qualifies as an enumerated source

under [section 3730(e)(4)(A)] only when the document itself is a 'congressional,

administrative, or Government Accounting Office report, hearing, audit, or

investigation.'"[86]  The term "report," the court reasoned, "most readily bears a

narrower meaning than simply 'something that gives information.'"[87]  "[I]t

connotes the compilation or analysis of information with the aim of synthesizing

that information in order to serve some end of the government . . . . It does not

naturally extend to cover the mechanistic production of documents in response to

a FOIA request made by a member of the public."[88]

---

[85]      *See id.* at 107 ("[W]e find that it strains the natural meaning of the statute to construe the terms 'report' and 'investigation' as broadly as some of our sister Circuits have done.").

[86]      *Id.* at 111 (citation omitted).

[87]      *Id.* at 107 (quoting *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 56 (1st Cir. 2009)).

[88]      *Id.*  The First, Third, and Fifth Circuits have held that any document produced in response to an FOIA request is an enumerated source.  *See Ondis*, 587 F.3d 49, 56-57; *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 175-76 (5th Cir. 2004); *United States ex rel. Mistick PBT v. Housing Auth.*, 186 F.3d 376, 383-84 (3d Cir. 1999).  In *Mistick*

The *Kirk* cases involved the Vietnam Era Veterans Readjustment Assistance Act ("VEVRAA"),[89] which requires government contractors to establish affirmative action programs for veterans.  The defendant contractor allegedly misrepresented its compliance with VEVRAA by either filing false "VETS-100" reports detailing the numbers of veterans the contractor employed or by certifying that it had filed VETS-100 reports when it had not done so.[90]  The documents produced in response to the relator's FOIA request consisted of the contractor's VETS-100 filings and letters indicating that no reports had been found for certain years.[91]  The Second Circuit held that neither the filings nor the letters were administrative reports under section 3730(e)(4)(A).[92]

---

*PBT v. Housing Authority*, the Third Circuit reasoned that the review and compilation of records the government must complete in order to respond to an FOIA request was sufficient analysis and investigation to render the resulting document production a "report."  *See Mistick*, 186 F.3d at 383-84; *see also Kirk II*, 601 F.3d at 108.  The First and Fifth Circuits relied on *Mistick* in setting their own standards. *See Ondis*, 587 F.3d at 56-57; *Reagan*, 384 F.3d at175-76.  The Second Circuit expressly rejected this reasoning, saying, "what the [government] does not do in [responding to an FOIA request] is synthesize the documents or their contents with the aim of itself gleaning any insight or information."  *Kirk II*, 601 F.3d at 108.

[89]    *See* 38 U.S.C. § 4212.

[90]    *See Kirk I*, 606 F. Supp. 2d at 452.

[91]    *See Kirk II*, 601 F.3d at 111.

[92]    *See id.*

23

Outside the Second Circuit, several district courts have had occasion

to consider the general status of websites under section 3730(e)(4)(A).  Most of

these cases involved the question of whether a website qualifies as "news

media,"[93] while one, *United States ex rel. Brickman v. Business Loan Express,*

*LLC*,[94] concerned loan disclosures available on the Small Business Administration

("SBA") website in what the court in *Brickman* described as a "public report."[95]

The court in *Brickman* held that the information on the SBA website was publicly

---

[93]    *See United States ex rel. Brown v. Walt-Disney World Co.*, No. 06
Civ. 1943, 2008 WL 2561975, at *4 (M.D. Fla. June 24, 2008) (finding that
Wikipedia entry qualifies as "news media"), *aff'd*, 361 F. App'x 66 (11th Cir.
2010); *United States ex rel. Unite Here v. Cintas Corp.*, No. 06 Civ. 2413, 2007
WL 4557788, at *14 (N.D. Cal. Dec. 21, 2007) ("The 'fact' of the contracts
between [defendant] and the federal government was publicly disclosed in the
news media, as that information was available on the Internet."). *But see United
States ex rel. Liotine v. CDW Gov't, Inc.*, No. 05 Civ. 33, 2009 WL 3156704, at *6
n.5 (S.D. Ill. Sept. 29, 2009) (finding that publication posted on University's
purchasing services website and "not easily available to the public" not a public
disclosure).

[94]    *See* No. 05 Civ. 3147, 2007 WL 4553474, at *4 (N.D. Ga. Dec. 18,
2007), *aff'd*, 310 F. App'x 322 (11th Cir. 2009).

[95]    *Id. Liotine* read the "public report" description in *Brickman* as an
acknowledgment that the document available on the website was itself an
administrative report. *See Liotine*, 2009 WL 3156704, at *6 n.5.  However, as the
*Brickman* court did not state this directly, and as it did not describe the "public
report" in any detail, this conclusion seems unwarranted.  In any event, *Brickman*
appeared to base its public disclosure finding on the document's public
availability, not on a finding that the document was an administrative report. *See
Brickman*, 2007 WL 4553474, at *4.

disclosed, though in doing so it relied on several of the circuit decisions that the Second Circuit expressly declined to follow in *Kirk II*.[96]  To the extent that any of these cases articulated reasons for treating (or declining to treat) a website as an enumerated source, the analysis focused on whether the public may readily access the website and the information contained on the site.[97]

As a matter of first impression, and in light of the Second Circuit's analysis in *Kirk II*, the J-51 database on the DOF website is an administrative report under section 3730(e)(4)(A).  The J-51 database is readily available to the public; any individual may look up the J-51 benefit history of any building in the City, the searches are free and unlimited, and both the database and the DOF website are easily navigable.[98]  Moreover, the J-51 database does not present raw, unanalyzed data.  Rather, it presents synthesized tax benefit histories for many different properties over many years, organized by block and lot number.[99]   By contrast, the documents produced in response to the FOIA request in the *Kirk*

---

[96]    *See Brickman*, 2007 WL 4553474, at *4 ("All of these records are widely available to the general public, and thus constitute public disclosures.") (citing *Reagan*, 384 F.3d at 176; *Mistick*, 186 F.3d at 383).

[97]    *See id.  See also Liotine*, 2009 WL 3156704, at *6 n.5 (finding publication on website "not easily available to the public").

[98]    *See* J-51 Benefit History Request Screen, *supra* note 37.

[99]    *See id.*

cases were merely duplicates of documents the contractor filed with the

Department of Labor and letters indicating that certain records had not been

found.[100]  Neither the filings nor the letters reflected any synthesis or organization

by the government.  Because the J-51 database is an enumerated source, Glenn

Gardens's J-51 status was publicly disclosed within the meaning of section

3730(e)(4)(A).[101]

Finally, as Rosner's allegations of fraud in the GG action are identical

to those in the IPN action,[102] the public disclosures involving Glenn Gardens

contained the material elements of the allegedly fraudulent transaction.

---

[100]    *Kirk II*, 601 F.3d at 111.

[101]    GG also argues that Glenn Gardens's J-51 status was publicly
disclosed in two annual DOF Office of Tax Policy reports: the Annual Report on
Tax Expenditures and the Annual Report on the New York City Property Tax. *See*
GG Mem. at 9.  These reports contain significant analysis and synthesis and are
produced in order to assist the City in policymaking. *See id.*  They are thus
"administrative reports" for the purposes of the public disclosure bar.  But these
reports do not identify Glenn Gardens. *See* Annual Report on Tax Expenditures,
Ex. A to 4/19/10 Declaration of Steven Robinson, Director of Research &
Analysis, DOF, in Support of GG's Motion to Dismiss ("Robinson Decl.");
Annual Report on the New York City Real Property Tax, Ex. B to Robinson Decl.
Although Glenn Gardens's J-51 information is part of the raw data used to
produce the reports, *see* Robinson Decl. ¶ 17, no one reading the reports would
have any basis on which to conclude anything about the tax status of any
particular building.  Thus, Glenn Gardens's tax status could not have been
disclosed through these reports.

[102]    *See* GG Compl. ¶¶ 28-37.

Accordingly, the public disclosure bar applies to Rosner's Complaint against GG and the City.

### B.    Rosner Is Not an Original Source

Because the material elements of Rosner's claims in both the IPN and GG actions were publicly disclosed prior to his initial *qui tam* suit, Rosner can only avoid section 3730(e)(4)'s jurisdictional bar if he is an original source of the "information on which the allegations are based."[103]  Rosner argues that he is an original source of the information underlying his allegations – specifically, that Independence Plaza and Glenn Gardens had J-51 abatements and that both complexes received Enhanced Vouchers for their section 8 tenants based on market rents – because he obtained the information "through his own investigative efforts."[104]  Rosner learned of the complexes' J-51 statuses by calling HPD and DOF and also by searching the J-51 database.[105]  Rosner learned that Independence Plaza and Glenn Gardens were charging market rents to their

---

[103]    31 U.S.C. § 3730(e)(4)(B).  When evaluating the original source requirement, the relevant allegations are those of the relator, not those that triggered the public disclosure bar.  *Rockwell*, 549 U.S. at 473.

[104]    Rosner Mem. at 31.

[105]    *See* 5/21/10 Declaration of Edmund Rosner in Opposition to Defendants' Motions to Dismiss ¶¶ 18, 33.

27

section 8 tenants by interviewing the tenants and reviewing their leases.[106]  Rosner

also states that he did significant legal research into New York City's rent and tax

laws.[107]

These investigative efforts do not make Rosner an original source, as

they do not show that he had "direct and independent knowledge" of the

information underlying his allegations of fraud.  Indeed, Rosner's own declaration

shows that he obtained the core information in his complaint from third parties –

namely HPD, DOF, other Independence Plaza and Glenn Gardens tenants.  Nor

does Rosner's legal research bring him within the original source exception, as

neither "collateral research,"[108] nor other information that enables a relator "to

understand the significance of a publicly disclosed transaction or allegation,"[109]

turns an otherwise jurisdictionally barred relator into an original source in the

Second Circuit.[110]

---

[106]    *See id.* ¶¶ 30, 35.

[107]    *See id.* ¶¶ 17, 20, 27.

[108]    *Kreindler*, 985 F.2d at 1159.

[109]    *Feldman*, 674 F. Supp. 2d at 482.

[110]    Rosner cites language from the Third Circuit's decision in *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, to argue that investigative efforts bestow direct and independent knowledge on the investigator.  *See* 944 F.2d 1149, 1161 (3d Cir. 1991) ("[R]elators may also

### C.     IPN's Motion for Attorneys' Fees

This Court's lack of subject matter jurisdiction over the IPN action is not so staggeringly obvious that it renders Rosner's action "*objectively frivolous.*"[111] Nor is there evidence that Rosner's suit was primarily intended to vex or harass IPN or any other defendant.[112] Accordingly, IPN may not recover attorneys' fees under section 3730(d)(4).

## V.     CONCLUSION

For the reasons set forth above, the motions to dismiss the Complaint against IPN and the City in the IPN action are granted.  The motions to dismiss the Complaint against GG and the City in the GG action are also granted.  IPN's motion for attorneys' fees is denied.  The Clerk of the Court is directed to close these motions (Docket Nos. 30, 33 in 06 Civ. 7115; Docket Nos. 27, 32 in 06 Civ. 11440) and this case.

---

qualify [as original sources] if their information results from their own investigations."). However the Second Circuit has not adopted *Stinson*'s approach to investigators under the original source exception, *see Kreindler*, 985 F.2d at 1159, and it is Second Circuit, not Third Circuit, precedent that binds this Court.

[111]     *Mikes*, 274 F.3d at 705.

[112]     *See* 31 U.S.C. § 3730(d)(4).

29

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        July 1, 2010
              New York, New York

## - Appearances -

**For Plaintiff:**

Timothy J. McInnis, Esq.
McInnis Law
521 5th Avenue, Suite 1700
New York, NY 10175-0038
(212) 292-4573

**For Defendants WB/Stellar IP Owner L.L.C., Independence Plaza Associates, LLC, Independence Plaza, L.P., Stellar Management, and Laurence Gluck:**

Stephen B. Meister, Esq.
James M. Ringer, Esq.
Jeanette R. Blair, Esq.
Stacey M. Ashley, Esq.
Meister Seelig & Fein LLP
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, NY 10017
(212) 868-1010

**For Defendant Glenn Gardens Associates, L.P.:**

Peter C. Neger, Esq.
Gillian I. Epstein, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

**For Defendant City of New York:**

Stephen Kitzinger
Assistant Corporation Counsel
New York City Law Department

31

100 Church Street, Room 2-126
New York, NY 10007
(212) 788-0849