UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

UNITED STATES OF AMERICA,

          Plaintiff,

   - against -

WB/STELLAR IP OWNER LLC,
INDEPENDENCE PLAZA
ASSOCIATES, LLC, INDEPENDENCE
PLAZA, L.P., and LAURENCE GLUCK,

      Defendants.

**OPINION AND ORDER**

06 Civ. 7115 (SAS)

------------------------------------------------ X

UNITED STATES OF AMERICA,

          Plaintiff,

   - against -

GLENN GARDENS ASSOCIATES, L.P.,

      Defendant.

**OPINION AND ORDER**

06 Civ. 11440 (SAS)

------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      The United States of America (the "Government") brings this action

1

against WB/Stellar IP Owner, LLC, Independence Plaza Associates, LLC, Independence Plaza Associates, LP, and Laurence Gluck (collectively, "IPN") and Glenn Gardens Associates, L.P. ("Glenn Gardens"), the respective owners of two Manhattan housing developments (together, the "Owners").  The Government seeks recovery of federal housing assistance payments, which the Owners allegedly overcharged the Department of Housing and Urban Development ("HUD"), and a reformation of the housing assistance payment contracts entered into pursuant to Section 8 of the United States Housing Act.[1]  The Government also seeks a declaratory judgment that both housing developments are subject to New York City's Rent Stabilization Law ("RSL") based on their respective receipt of J-51 tax abatements subsequent to their withdrawal from the Mitchell-Lama Program ("MLP").[2]  The parties now bring cross-motions for summary judgment. For the reasons stated below, the Owners' joint motion is granted and the Government's motion is denied.

## II.   BACKGROUND

### A.   Factual and Regulatory Background

#### 1.   The Mitchell-Lama Housing Program

---

[1]      *See* Complaint against IPN ("IPN Compl.") ¶ 1; Complaint against Glenn Gardens ("GG Compl.") ¶ 1.

[2]      *See* IPN Compl. ¶ 1; GG Compl. ¶ 1.

2

Independence Plaza North and Glenn Gardens are both residential housing developments located in Manhattan.[3]  The developments were constructed in the mid-1970's[4] by limited-profit housing companies pursuant to Article II of New York's Private Housing Finance Law ("PHFL"),[5] commonly referred to as the Mitchell-Lama Housing Program.[6]  Under the MLP, a housing development is subject to mandatory rent regulation in exchange for long-term, low-interest government mortgage loans.[7]  An owner may opt out of the MLP after twenty years by paying the remaining balance of a property's mortgage.[8]  Upon exiting the MLP, the property is no longer subject to rent regulation under the PHFL, though it

---

[3]     Independence Plaza North is located in the Tribeca section of Manhattan and consists of three buildings, several townhouses, and over 1300 units.  *See* IPN Compl.  ¶ 24.  Glenn Gardens is a 266-unit residential apartment building located at 175 West 87th Street in Manhattan.  *See* GG Compl. ¶ 21.

[4]     Independence Plaza North was completed in 1974.  *See* IPN Compl. ¶ 25.  Glenn Gardens was completed in 1976.  *See* GG Compl. ¶ 22.

[5]     *See* PHFL §§ 10-37.

[6]     *See* IPN Compl. ¶ 25; *see* GG Compl. ¶¶ 22-23.  The MLP sought to encourage the construction of affordable low- and moderate-income housing by granting developers loan and tax incentives and regulating rents, profits, transfer of property and tenant selection.  *See* IPN Compl. ¶ 26; PHFL § 11.

[7]     *See* IPN Compl. ¶¶ 25-26; *see* GG Compl. ¶¶ 22-23.  In addition, each property's mortgage was insured by the Federal Housing Administration ("FHA"), a division of HUD.  *See* IPN Compl. ¶ 25; GG Compl. ¶ 22.

[8]     *See* PHFL § 35(2).

3

may be subject to rent regulation under other New York State or New York City laws.[9]

In the early 2000's, the Owners notified the New York City Department of Housing Preservation and Development ("HPD"), the United States Department of Housing and Urban Development ("HUD"), and the tenants of their intention to pay off the FHA-insured mortgages on their respective properties, subsequently withdraw from the MLP, and dissolve the limited-profit housing companies.[10]  The Owners also announced that upon withdrawal from the MLP, the rental units would no longer be subject to rent regulation and would be priced at fair market rates.[11]  HPD subsequently issued a Letter of No Objection and the Owners pre-paid their FHA-insured mortgages.[12]  Glenn Gardens exited the MLP

---

[9]      *See id.* § 35(3).

[10]      *See* 12/1/10 Declaration of Julie C. Walpert, Assistant Commissioner of HPD ("Walpert Decl.") ¶¶ 5, 12-13; 1/27/11 Declaration of Laurence Gluck ("Gluck Decl.") ¶¶ 9-12; 12/4/01 Letter from Glenn Gardens to HUD, Ex. 3 to 1/27/11 Declaration of Martin I. Siroka, Counsel to Glenn Gardens Associates, L.C., ("Siroka Decl."); Notice from Glenn Gardens to Tenants, Ex. 5 to Siroka Decl.

[11]      *See* Walpert Decl. ¶¶ 12-13; Gluck Decl. ¶ 12; 1/27/11 Declaration of Sherwood Guernsey, General Counsel for Glenn Gardens Associates, L.P., in Support of Defendant Glenn Gardens Associates, L.P.'s Motion for Summary Judgment ("Guernsey Decl.") ¶ 4.

[12]      *See* 6/28/04 Letter of No Objection, Ex. 5 to the Gluck Decl.

4

on June 27, 2003,[13] while IPN did so on June 28, 2004 (the "Exit Date").[14]

## 2. The Federal Section 8 Program

The federal government provides housing assistance to low-income families through Section 8 of the United States Housing Act of 1937 (the "Section 8 Program").[15] The Section 8 Program is administered on the federal level by HUD and implemented locally by public housing authorities ("PHAs").[16] The statute authorizes HUD to provide funds to the PHA, which in turn partially subsidizes the rental payments of qualifying Section 8 tenants in privately-owned buildings.[17] Qualifying tenants must sign a lease with the building owner and pay a specified percentage of their income toward the total rent.[18] The building owners,

---

[13]   See GG Compl. ¶ 24.

[14]   See IPN Compl. ¶ 27.

[15]   See 42 U.S.C. § 1437f(a).  The Section 8 Program was initially introduced through the Housing and Community Development Act of 1974.  See Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662-66 (1974) (codified as amended at 42 U.S.C. § 1437f).

[16]   See 42 U.S.C. § 1437f.  In New York City, HPD serves as the local PHA.

[17]   See id. § 1437f(o)(1)(A).

[18]   See id. §§ 1437f(o)(7), 1437f(o)(2)(A).  This specified percentage, referred to as the Total Tenant Payment, is the greater of thirty percent of the family's monthly adjusted income, ten percent of the monthly gross income, the "welfare rent," or the PHA-determined minimum rent.  See Housing Choice Voucher Program Guidebook § 6.2.

in turn, enter into Housing Assistance Payment ("HAP") contracts with the PHA, which specify the owner's obligations and the amount to be paid by the PHA to the owner.[19] The Housing Assistance Payment is the difference between either the total rent charged by the owner or the "Payment Standard" calculated by the PHA,[20] whichever is lower, and the amount contributed by the assisted tenant.[21] The HAP contract is approved only after the PHA concludes that the total rent charged by the owner is reasonable.[22]

When a landlord makes a pre-payment on a mortgage in order to withdraw a property from a public program intended to ensure affordable housing, HUD is authorized to provide an assisted tenant with an "enhanced voucher."[23] These vouchers allow qualified tenants to remain in their residence by subsidizing any market-based increase in rent, so long as the charged amount is reasonable.[24] The tenants' share of the rent remains at the rate charged at the time of the

---

[19]    *See* Housing Choice Voucher Program Guidebook §§ 11.1-11.13.

[20]    For an explanation of how a PHA calculates the Payment Standard, *see id.* §§ 7.1-7.5.

[21]    *See* 42 U.S.C. §§ 1437f(o)(2)(A)-(B).

[22]    *See id.* § 1437f(o)(10)(A).

[23]    *See id.* § 1437f(t)(2).

[24]    *See id.* § 1437f(t)(1)(B).

6

withdrawal.[25]  In addition to the reasonableness limitation, the total rent paid to the

owner may be limited by local rent control laws.[26]  In that event, the rent that the

owner may charge is the lesser of the PHA-determined reasonable rent and the

regulated rent.[27]

Prior to their withdrawal from the MLP, both IPN and Glenn Gardens

had numerous tenants participating in the Section 8 Program.  When the Owners

announced their planned exit from the MLP and the resulting return to fair market

rates, they also informed the tenants that they should apply to HUD for enhanced

vouchers.[28]  Numerous families did so and HUD approved the additional assistance

to those who were eligible.[29]  Accordingly, using HUD-provided funds, HPD

---

[25]     *See id.* § 1437f(t)(1)(A).

[26]     *See* 24 C.F.R. § 982.509.

[27]     *See* Housing Choice Voucher Program Guidebook § 9.2.

[28]     *See* IPN Compl. ¶ 4; GG Compl. ¶ 4.

[29]     *See* GG Compl. ¶ 5.  For those tenants that were not eligible to receive
Section 8 enhanced vouchers after the withdrawal from the MLP, the Owners
negotiated Landlord Assistance Program ("LAP") agreements with them.  *See*
Excerpts from the Deposition of Laurence Gluck ("Gluck Dep."), Ex. F to 1/28/11
Declaration of Jeffrey Oestericher, Counsel for the United States ("Oestericher
Decl."), at 10; 1/24/03 Letter from Martin I. Siroka to John Warren, Ex. M to
Oestericher Decl.  The LAP agreements provided that rent increases for these
tenants would be similar to what tenants would receive under statutory rent
stabilization.  In return, these tenants agreed not to bring litigation to delay MLP
withdrawal or to delay future rent increases.  *See* Gluck Decl. ¶ 7.

subsidized the difference between the fair market rate and the required contribution from the Section 8 tenants.[30]

### 3.    J-51 Tax Abatements

New York state law authorizes certain municipalities to offer tax breaks to property owners that rehabilitate and substantially improve their buildings.[31]  In New York City, the so-called "J-51" program provides multi-year tax exemptions and/or abatements to property owners who complete eligible projects.[32]  Eligible projects include rehabilitations, major capital improvements, specified alterations and improvements, and conversion of non-residential buildings into multiple dwellings.[33]  HPD and the New York City Department of Finance ("DOF") administer the J-51 program.  In addition, individual rental units in buildings receiving J-51 benefits must register with the State Division of Housing and Community Renewal ("DHCR").  A property receiving J-51 benefits is always subject to rent regulation.[34]  If a property is not already subject to rent

---

[30]     *See* GG Compl. ¶ 6; Gluck Dep. at 10, 34-36; Excerpts from Deposition of Martin I. Siroka, Ex. K to Oestericher Decl., at 17, 27, 30-32.

[31]     *See* N.Y. Real Prop. Tax Law ("RPTL") § 489.

[32]     *See* N.Y.C. Admin. Code § 11-243.

[33]     *See id.* § 11-243(b).

[34]     *See* 28 Rules of the City of New York ("RCNY") § 5-03(f).

regulation, the receipt of J-51 benefits triggers the applicability of the RSL to the property.[35]  However, J-51 buildings are *exempt* from regulation under the RSL if they are already subject to rent regulation under another state statute.[36]

In the late 1990's, while rent-regulated under the PHFL, the then owners of the properties began receiving J-51 benefits pursuant to eligible capital improvements they had previously completed on their respective properties.[37] DOF authorized IPN and Glenn Gardens to receive $7,550 and $4,408, respectively, in annual tax abatements for up to fourteen years.[38]  Prior to their

---

[35]    *See* N.Y.C. Admin. Code § 26-504.

[36]    *See id.* § 26-504(a)(1)(b).

[37]    On September 24, 1998, HPD granted IPN's predecessor owner a Certificate of Eligibility, which listed the certified reasonable cost of the eligible capital improvement as $90,600, specified an abatement percentage of ninety percent and indicated that the property was entitled to fourteen years of tax exemption for any increase in the assessed valuation resulting from the improvement.  Based upon the Certificate of Eligibility, the DOF implemented a J-51 tax abatement commencing on January 1, 1999.  *See* Declaration of Matthew Shafit, HPD Deputy Commissioner of Legal Affairs ("Shafit Decl."), Ex. C to the Oestericher Decl., ¶¶ 5-6.  On June 26, 1996, HPD granted Glenn Gardens' predecessor owner a Certificate of Eligibility, which listed the certified reasonable cost of the eligible capital improvement as $52,900, specified an abatement percentage of ninety percent and indicated that the property was entitled to fourteen years of tax exemption.  DOF implemented a J-51 tax abatement beginning January 1, 1997.  *See id.* ¶¶ 13-14.

[38]    *See* Gluck Decl. ¶ 16; Guernsey Decl. ¶ 3.  The annual tax bills for both IPN and Glenn Gardens exceed one millions dollars.  *See* Gluck Decl. ¶ 17; Guernsey Decl. ¶ 11.

9

MLP exit and resulting rent deregulation, the Owners sent a letter to DOF stating that the limited-profit housing companies were being dissolved and that the "property shall forthwith be restored to a full taxpaying position effective as of the dissolution date."[39]

Despite this notice, DOF failed to terminate the Owners' J-51 tax benefits upon their respective exits from the MLP in 2003 and 2004.[40] According to IPN, it first learned of the oversight in July of 2005 when the Independence Plaza North Tenants' Association informed IPN that receipt of the J-51 tax abatement had continued after the Exit Date.[41] Similarly, Glenn Gardens claims it first learned of the continued receipt of the tax benefit in the fall of 2007 when a tenant raised the issue in the context of an eviction action.[42] The Government contends that the Owners were aware as early as 2003 and 2004, respectively, of

---

[39] 6/28/04 Letter from Laurence Gluck to Martha E. Stark, DOF Commissioner ("IPN Letter to DOF"), Ex. 1 to the Siroka Decl.; 6/27/03 Letter from Murray Smith, Glenn Gardens Housing Co., Inc. President, to Martha E. Stark, DOF Commissioner ("GG Letter to DOF"), Ex. 6 to the Siroka Decl.

[40] *See* Gluck Decl. ¶ 18; Guernsey Decl. ¶¶ 11-12; Shafit Decl. ¶¶ 8-9, 16-17.

[41] *See* Gluck Decl. ¶ 15; Siroka Decl. ¶ 6; 7/20/05 Letter from Diane Lapson, Independence Plaza North Tenants' Association President, to Laurence Gluck, Ex. E to the Oestericher Decl.

[42] *See* Guernsey Decl. ¶ 12.

10

their post-Exit Date receipt of J-51 benefits.[43]  At the time of the Exit Date, HPD did not, as a matter of policy, check if properties withdrawing from the MLP continued to receive J-51 benefits.[44]

According to the Owners, upon learning of the receipt of J-51 benefits, they contacted HPD and asserted that the benefits should have been terminated as a matter of law upon MLP withdrawal.[45]  The Owners requested that HPD retroactively terminate the J-51 benefits and stated that they were willing to pay back all tax benefits received after the Exit Date.[46]  HPD subsequently decided that, "in an exercise of discretion based upon equitable and public policy considerations and the special facts and circumstances" concerning the respective properties, the J-51 benefits should be retroactively terminated as of the Exit Date.[47]  DOF adjusted its records to reflect this retroactive termination[48] and the

---

[43]    In support of this contention, the Government points to a handwritten note on IPN's title report for tax year 2003/2004, which estimates the expected J-51 tax abatement for tax year 2004/2005, *see* Title Reports, Ex. D to the Oestericher Decl., and a statement made by Glenn Gardens' general counsel that Glenn Gardens' managing agent received tax statements reflecting the abatement between 1998 and 2007, *see* Guernsey Decl. ¶¶ 3, 11.

[44]    *See* Walpert Decl. ¶¶ 6, 14.

[45]    *See* Shafit Decl. ¶¶ 9, 17.

[46]    *See id.*

[47]    *Id.* ¶¶ 10, 18; 6/7/06 Letter from Shaun Donovan, HPD Commissioner, to Scott Stringer, Manhattan Borough President, Ex. D to the

11

Owners reimbursed DOF for the tax abatements received after the Exit Date.[49]

## B.   Procedural Background

### 1.   The Related State Court Proceeding Against IPN

After IPN's withdrawal from the MLP in 2004, tenants who were in possession of IPN units on the Exit Date brought a declaratory judgment action in New York state court against IPN alleging that their units were subject to the RSL based upon post-Exit Date receipt of J-51 benefits.[50]  Certain IPN tenants who had leased apartments at fair market values after IPN's withdrawal from the MLP brought a similar declaratory judgment action.[51]  On April 3, 2009, Judge Marcy S. Friedman of the New York State Supreme Court remanded both actions to the DHCR for a determination of IPN's rent-stabilized status.[52]  On March 5, 2010, the

---

Supplemental Declaration of Jeffrey Oestericher ("Oestericher Supp. Decl.").

[48]     *See* Shafit Decl. ¶¶ 11, 19; DOF J-51 Benefit Summary, Ex. 7 to the Gluck Decl.

[49]     *See* IPN Payment Confirmation, Exs. 8-10 to the Gluck Decl.; Guernsey Decl. ¶ 15.

[50]     *See Independence Plaza North Tenants' Assoc. v. Independence Plaza North*, 907 N.Y.S.2d 611 (Sup. Ct. N.Y. Co. 2010).

[51]     *See Denza v. Independence Plaza Associates, LLC*, 851 N.Y.S.2d 68 (table) (Sup. Ct. N.Y. Co. 2007).

[52]     *See Independence Plaza North Tenants' Assoc.*, 907 N.Y.S.2d at 613.

DHCR held that IPN is not subject to the RSL.[53]  On August 30, 2010, finding the issue to be one of pure statutory interpretation, Judge Friedman declined to defer to the DHCR decision and held that IPN was subject to the RSL.[54]  Judge Friedman reasoned that the rules implementing the J-51 tax abatement program did not require termination of J-51 benefits upon MLP withdrawal.[55]  Rather, because termination is discretionary, continued receipt of J-51 benefits triggered the applicability of the RSL.[56]  IPN appealed this decision to the New York State Appellate Division, First Department, and the case is currently pending.

### 2.    The Instant Proceeding

In 2006, relator Edmund Rosner, a tenant at IPN, filed a qui tam complaint on behalf of the United States against the Owners.[57]  Rosner alleged violations of the False Claims Act ("FCA")[58] in connection with the Owners'

---

[53]    *See id.*

[54]    *See id.* at 617.

[55]    *See id.*

[56]    *See id.* at 617-18.

[57]    *See U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396 (S.D.N.Y. 2010).

[58]    *See* 31 U.S.C. §§ 3729-3733.

13

receipt of federal Section 8 subsidies at fair market rates.[59]  In 2009, the

Government partially intervened bringing equitable claims for damages.[60]  The

Government seeks reimbursement for the alleged overpayment of Section 8

subsidies, a reformation of the HAP contracts to reflect the proper amount of

Section 8 subsidies owed to the Owners, and a declaratory judgment that both IPN

and Glenn Gardens are subject to the RSL.[61]

      The Government now moves for summary judgment arguing that, as a

matter of law, the receipt of J-51 tax benefits after the buildings withdrew from the

MLP subjected the buildings to rent regulation under the RSL.[62]  Thus, the Owners

were not entitled to any HUD-provided Section 8 subsidies above the rent-

stabilized rate.  The Owners cross-move for summary judgment, contending that,

as a matter of law, withdrawal from the MLP, and the simultaneous cessation of

---

[59]    *See U.S. ex rel. Rosner*, 739 F. Supp. 2d at 397-98.  This Court dismissed Rosner's qui tam complaint on July 2, 2010 because, as relator, Rosner relied on information that had "already entered the public domain" and his action was therefore barred under the False Claims Act.  *Id.* at 402.

[60]    *See* GG Compl. at 1; IPN Compl. at 1.

[61]    *See* GG Compl. at 10-14; IPN Compl. at 10-14.

[62]    *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem.") at 1-2.

rent regulation under the PHFL, terminated the J-51 tax benefits.[63]  Therefore, the

erroneous post-Exit Date receipt of J-51 benefits did not trigger rent regulation

under the RSL and the Owners were entitled to the Section 8 subsidies they

received at the fair market rate.

## III.   LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."[64]  "An issue of fact is genuine if

'the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'  A fact is material if it 'might affect the outcome of the suit

under the governing law.'"[65]  "[T]he burden of demonstrating that no material fact

---

[63]    *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 1-4.

[64]    Fed. R. Civ. P. 56(c).

[65]    *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

exists lies with the moving party . . . ."[66]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[67]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[68] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[69]  However, "'all that is required [from the non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge

---

[66]   *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008).  *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[67]   *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  *Accord In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks and citations omitted).

[68]   *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[69]   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

16

to resolve the parties' differing versions of the truth at trial.'"[70]

"In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."[71] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[72]   Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[73]

## IV.   APPLICABLE LAW

### A.   Collateral Estoppel

Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to

---

[70]   *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

[71]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

[72]   *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[73]   *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).  *Accord Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

the first case."[74]  The doctrine serves to avoid duplicative and costly litigation, conserve judicial resources, prevent inconsistent decisions, and encourage reliance on adjudication.[75]  Furthermore, a party may collaterally estop an opposing party from re-litigating an issue on which the opposing party previously lost even if the party seeking to do so was not a party to the first action.[76]  However, because non-mutual "offensive collateral estoppel" does not promote judicial economy in the same manner as traditional collateral estoppel and may result in unfairness to a defendant, the decision whether to allow it is committed to the "broad discretion" of the trial courts.[77]

In addition, federal courts are required to give the same preclusive effect to state court judgments that would be given by a another court in the state in which the judgment was rendered.[78]  Thus, federal courts have "consistently accorded preclusive effect to issues decided by state courts."[79]  Under New York

---

[74]     *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

[75]     *See id.*

[76]     *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

[77]     *Id.*

[78]     *See* 28 U.S.C. § 1738.

[79]     *Allen,* 449 U.S. at 95.

18

law, in order for collateral estoppel to apply, "'[t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.'"[80]  Although New York allows non-mutual offensive collateral estoppel,[81] the doctrine is a flexible one that should not be "mechanistically applied."[82]  In this respect, the New York Court of Appeals has held:

> In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of . . . fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results.  No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings.[83]

Finally, when a federal court must decide an issue of state law that has not been resolved by the highest court of the state, the federal court's job is to

---

[80]     *Launders v. Steinberg*, 9 N.Y.3d 930, 932 (2007) (quoting *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71 (1969)).

[81]     *See Gramatan Home Investors Corp. v. Lopez*, 46 N.Y.2d 481, 485 (1979) ("[T]he previous requirement that there be mutuality of estoppel is now a dead letter.") (quotation marks and citations omitted).

[82]     *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292 (1980).

[83]     *Buechel v. Bain*, 97 N.Y.2d 295, 304 (2001) (quoting *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 72 N.Y.2d 147, 153 (1988)).

either predict how the highest court will rule or certify the question to the highest court for a definitive answer.[84]   Accordingly, the rulings of lower New York state courts should be considered only  insofar as they "persuasively appl[y] New York Court of Appeals decisions."[85]

### B.    Statutory and Regulatory Framework

J-51 tax benefits are governed by New York state law, the Administrative Code of the City of New York, and the RCNY.  Section 489 of the RPTL authorizes certain municipalities to offer tax benefits to property owners who make specified improvements to residential buildings.[86]  In New York City, Administrative Code § 11-243 (formerly Administrative Code § J 51-2.5) exempts from taxation "any increase in the assessed valuation of real property" resulting from such improvements.[87]  Title 28 of the RCNY, which are promulgated by HPD, implement the J-51 benefits.[88]

Both the RSL and section 5-03 of Title 28 of the RCNY contain

---

[84]    *See DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005).

[85]    *Allocco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 368 (S.D.N.Y. 2005).

[86]    *See* RPTL § 489(1)(a).

[87]    N.Y.C. Admin. Code § 11-243(b).

[88]    *See* 28 RCNY §§ 5-01–5-10.

provisions that, together, establish when a property is eligible for J-51 benefits as well as the effect such benefits have on a property's status with respect to rent regulation.  Section 5-03(f)(1) of Title 28 of the RCNY provides that "to be eligible to receive tax benefits under the Act and for at least so long as a building is receiving the benefits of the Act" the building "shall be subject to rent regulation pursuant to" the City Rent and Rehabilitation Law, the RSL, the PHFL, the Emergency Tenant Protection Act of 1974 ("ETPA") or any federal law providing for rent regulation.[89]  Section 26-504(c) of the RSL provides that dwelling units in receipt of J-51 benefits are generally subject to rent regulation under the RSL.[90] However, section 26-504(a)(1)(b) exempts from RSL regulation dwelling units that are "subject to rent regulation under the private housing finance law or any other state law."  In addition, a building may be subject to the RSL by virtue of receiving J-51 benefits, even though it is already subject to the RSL for a different reason. When this happens, RSL regulation will continue unaffected after the termination of J-51 tax benefits.[91]

---

[89]    *Id.* § 5-03(f)(1); N.Y.C. Admin. Code § 11-243(i)(1).

[90]    *See* N.Y.C. Admin. Code § 25-504(c).

[91]    Section 26-504(c) of the RSL provides:

[I]f such dwelling unit would have been subject to [the RSL] or

21

Read together, these provisions create two ways in which owners who make the necessary improvements can become eligible to receive J-51 benefits. First, the building may be eligible if the units are already subject to rent regulation. Alternatively, the receipt of J-51 benefits can trigger rent regulation under the RSL.[92] If the units were already subject to rent regulation under a state law other than the RSL, however, receipt of J-51 benefits will not trigger regulation under the RSL.

The statutory scheme also addresses when the benefits may and must be revoked and the effect of revocation upon rent regulation. Section 5-07(e) of Title 28 of the RCNY provides that the HPD Commissioner "*may*" reduce or revoke tax benefits upon a finding of fraud, misrepresentation, or a false

------

the [ETPA] in the absence of [J-51 benefits], such dwelling unit shall, upon expiration of such benefits, continue to be subject to [the RSL] or the [ETPA] to the same extent and in the same manner as if [J-51 benefits] had never applied thereto.

N.Y.C. Admin. Code § 26-504(c). *Accord Roberts v. Tishman Speyer Props., L.P.*, 62 A.D.3d 71, 77 (1st Dep't 2009) ("The RSL expressly acknowledges that a building may be subject to its provisions for more than one reason and states that when both J-51 and another basis concurrently require rent stabilization, the expiration of the J-51 benefits has no effect on the other.").

[92]     *See Roberts*, 62 A.D.3d at 83 (noting that the statutory scheme draws no distinction "based on whether a J-51 property was already subject to regulation prior to the receipt of such benefits").

statement.[93]  By contrast, Section 5-07(f) of Title 28 of the RCNY, entitled

"Additional grounds for revocation" provides that the DOF or HPD Commissioner

"*shall withdraw* tax exemption and tax abatement granted to a building pursuant to

the Act" under certain enumerated circumstances.[94]  Section 5-07(f)(3) requires

revocation if "[t]he building ceases to be subject to the rent regulatory provisions"

required to receive J-51 benefits.[95]

   The RPTL, RCNY, and RSL, as well as the Rent Stabilization Code

("RSC"), implementing the RSL, each contain vacancy deregulation provisions,

which state that, under certain circumstances, regulation may persist after the

revocation, termination or expiration of tax benefits until the current tenant vacates

the unit.  Section 489(7)(b)(2) of the RPTL provides that "[a]ny dwelling unit

subject to rent regulation . . . *as a result of* receiving a tax exemption or abatement

pursuant to this section shall be subject to such regulation until the occurrence of

the first vacancy of such unit after such benefits are no longer being received"

unless the tenant is given notice in the lease of an upcoming expiration.[96]  The RSC

---

[93]  28 RCNY §§ 5-07(e)(1), (3) (emphasis added).

[94]  28 RCNY § 5-07(f) (emphasis added).

[95]  *Id.* § 5-07(f)(3).

[96]  RPTL § 489(7)(b)(2) (emphasis added).

provision closely resembles section 489(7)(b)(2) by limiting vacancy deregulation to buildings that became regulated *solely* as a result of receiving J-51 tax benefits.[97]

The RSL and RCNY, on the other hand, provide that vacancy deregulation may apply so long as a building was receiving J-51 benefits, even if that was not the reason the building was subject to rent regulation. The RSL provides that "[u]pon expiration or termination *for any reason* of [J-51] benefits . . . any such dwelling unit shall be subject to [the RSL]" until the first vacancy unless notice of expiration is provided.[98] Similarly, the RCNY states that vacancy deregulation applies to "any building *receiving* [J-51] benefits."[99] In addition, the RCNY provides that "[r]ent regulation shall not be terminated by the waiver or revocation of [J-51] tax benefits."[100] In this way, the statutory scheme protects tenants from deregulation following the termination of J-51 tax benefits in certain circumstances.

---

[97]     *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 2520.11(o) (stating that vacancy deregulation only applies after J-51 benefits have ceased if the building was made subject to rent regulation "solely as a condition of receiving [J-51] tax benefits").

[98]     N.Y.C. Admin. Code § 26-504(c) (emphasis added).

[99]     28 RCNY § 5-03(f)(3)(I) (emphasis added).

[100]     *Id.* § 5-03(f)(3)(ii).

24

## C.     Statutory Interpretation

The application of a statute's terms to undisputed facts is a question of law to be resolved by the court.[101]   Where those terms are unambiguous, the "sole function of the courts is to enforce it according to its terms."[102]   "A departure from the plain text of a statute is warranted only in the rare case where the anomalous result rises to the level of a 'patent absurdity.'"[103]   Courts must "'look to the provisions of the whole law, and to its object and policy'" rather than to a provision "'in isolation from the context of the whole Act.'"[104]   Furthermore, courts should read statutes so as "to give effect, if possible, to every clause and word of a statute."[105]   Accordingly, a court should "avoid statutory interpretations

---

[101]     *See Stissi v. Interstate Ocean Transport Co. of Philadelphia*, 765 F.2d 370, 374 (2d Cir. 1985).

[102]     *U.S. v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (quotation marks and citations omitted). *Accord Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says.").

[103]     *United States v. Williams*, 558 F.3d 166, 174 (2d Cir. 2009) (quoting *Hubbard v. United States*, 514 U.S. 695, 703 (1995)).

[104]     *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962)).

[105]     *Duncan v. Walker*, 533 U.S. 167, 174 (2001).  *Accord United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992) (holding that "a statute must, if possible, be construed in such fashion that every word has some operative effect").

that render provisions superfluous."[106]  With respect to particular statutory language, "[t]he word 'shall' is ordinarily the language of command"[107] while "the word 'may' customarily connotes discretion."[108]  This construction is particularly important where the two words are used in close proximity to one another.[109]

## V.    DISCUSSION

### A.    Collateral Estoppel

In the related state action, the New York Supreme Court held that the apartment units in Independence Plaza North were subject to the RSL by virtue of the Owners' post-Exit Date receipt of J-51 tax abatements.[110]  The Government, though not a party to that proceeding, argues that IPN should now be collaterally estopped from re-litigating the issue in federal court.[111]  IPN does not dispute that the same issue was necessarily decided in the state court.  Rather, IPN asks that the Court exercise its broad discretion and decline to apply the doctrine in the interest

---

[106]     *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994).

[107]     *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001).

[108]     *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005).

[109]     *See id.*

[110]     *See Independence Plaza North Tenants' Assoc.*, 907 N.Y.S.2d at 617.

[111]     *See* Pl. Mem. at 6-8.

26

of fairness.[112]

The policies underlying the doctrine of collateral estoppel would not be served by applying the doctrine in the instant case. Regardless of whether IPN is estopped from re-litigating the rent stabilization issue, this Court must decide the identical issue with respect to Glenn Gardens. Thus, applying the doctrine would not serve the purpose of preventing inconsistent decisions. In fact, an inconsistent decision with respect to two defendants under the same set of facts in the same court would erode public faith in adjudication rather than encourage reliance upon it. For the same reason, application of the doctrine would not conserve judicial resources. Finally, I note that the Government had ample opportunity to intervene in the state proceeding but instead chose to bring the action in federal court. For these reasons, IPN is not collaterally estopped from litigating the issue of rent stabilization in this forum.

Furthermore, the precise question presented in these cases — whether continued receipt of J-51 benefits after withdrawal from the MLP automatically triggers regulation under the RSL — has not yet been resolved by the New York Court of Appeals. Indeed, the decision that the Government urges should bind this

---

[112]     *See* 02/02/11 Letter from Stephen B. Meister, Counsel for IPN, to the Court, Ex. A to the Oestericher Supp. Decl. at 2-3.

Court is a lower court decision now pending in New York's intermediate appellate court. Accordingly, the role of this Court is to predict how the New York Court of Appeals would resolve the issue while giving due regard to any lower state court decisions.

### B.    Rent Stabilization

#### 1.    Revocation of J-51 Tax Benefits

The Government argues that the continued receipt of J-51 tax benefits after the Exit Date subjected the Owners' buildings to the RSL. Thus, any revocation or waiver of J-51 benefits while the buildings were under RSL regulation could not, by law, terminate the rent regulation.[113] To avoid the language of section 5-07(f)(3) of Title 28 of the RCNY,[114] which appears to require revocation of J-51 benefits upon cessation of rent regulation, the Government first contends that the regulatory provision does not apply. This is so, the Government argues, because there was never a cessation of rent regulation. When the Owners' buildings exited the MLP, and ceased to be rent regulated under the PHFL, the Government contends that the buildings immediately became subject to RSL

---

[113]    *See* 28 RCNY § 5-03(f)(3)(iii) ("Rent regulation shall not be terminated by the waiver or revocation of tax benefits.").

[114]    *See id.* § 5-07(f)(3).

28

regulation by virtue of their continued receipt of J-51 benefits.  Thus, because HPD did not revoke the J-51 benefits, there was never a cessation of rent regulation.[115]

The Owners counter that while the buildings were regulated under the PHFL, receipt of J-51 benefits did not trigger RSL regulation.  Therefore, once regulation under the PHFL was extinguished by MLP withdrawal there was a complete cessation of rent regulation and section 5-07(f)(3) *required* the Commissioner of HPD or DOF to immediately withdraw the J-51 benefits. Therefore, the erroneous receipt of J-51 benefits after the buildings withdrew from the MLP could not trigger the RSL because the benefits had been revoked by force of law due to the Owners' ineligibility.[116]

Section 5-07(f)(3) unambiguously states that if a building ceases to be subject to rent regulation, the Commissioner "*shall* withdraw" J-51  benefits.[117] The plain language of the statute requires immediate withdrawal of the J-51 benefits upon cessation of rent regulation.  Any possibility that the regulation allows for agency discretion in the matter is made less likely by section 5-07(e) of Title 28 of the RCNY.  That section provides that the Commissioner "may" revoke

---

[115]     *See* Pl. Mem. at 8-12.

[116]     *See* Def. Mem. at 15-21.

[117]     28 RCNY § 5-07(f) (emphasis added).

29

J-51 benefits upon certain findings of owner misconduct.[118]  This contrast suggests

that the drafters of the regulation knew precisely how to make agency power

discretionary but decided not to do so in section 5-07(f)(3).[119]  Accordingly, section

507(f)(3), properly construed, makes revocation of J-51 benefits mandatory

immediately upon cessation of a pre-existing form of rent regulation.[120]

     The Government's theory of continuous regulation is inconsistent

with the mandatory language of section 5-07(f)(3).  Up until the Exit Date, the

buildings were regulated under the PHFL alone, despite the receipt of J-51

---

[118]    *Id.* § 5-07(e).

[119]    There is nothing in the language or structure of the regulation that suggests, as the Government contends, that section 5-07(f)(3) only requires revocation for owner misconduct.  Section 5-07(f) is entitled "Additional grounds for revocation" and merely provides for revocation of J-51 benefits where certain pre-conditions fail to be met.  The fact that other provisions in the section require withdrawal upon certain acts or omissions by building owners, *see, e.g.,* 28 RCNY § 5-07(f)(1) (requiring revocation if building is used as a hotel), *id.* § 5-07(f)(2) (requiring revocation in the event of unpaid taxes), does not affect the plain meaning of section 5-07(f)(3), which requires revocation when "a building ceases to be subject to" rent regulation. *Id.* § 5-07(f)(3).

[120]    The fact that HPD stated that it was exercising discretion when it decided to retroactively terminate the Owners' J-51 benefits does not control the outcome here.  The issue is strictly one of statutory interpretation, rather than one requiring specialized agency expertise, and therefore properly before this Court for its determination. *See Roberts v. Tishman Speyer Props., L.P.,* 13 N.Y.3d 270, 285 (2009) ("[W]here the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise.").

benefits.[121]   On the Exit Date, regulation under the PHFL ceased.  Though it is true

that the buildings were no longer exempt from RSL regulation — and RSL

regulation can be triggered by the lawful receipt of J-51 benefits by otherwise

unregulated buildings — the Owners' buildings were no longer eligible for J-51

benefits.  The cessation of PHFL regulation resulted in immediate, mandatory

revocation of J-51 benefits by force of law.  Therefore, any post-Exit Date receipt

of J-51 benefits could not, by law, have triggered RSL regulation because the

buildings were not authorized by the statutory and regulatory scheme to receive

them.  The Government's theory that the Owners' buildings automatically reverted

to RSL regulation upon the Exit Date ignores the mandatory language of section 5-

07(f)(3) and has no basis in either the text or scheme of the regulatory and statutory

framework.[122]   Accordingly, I predict that the New York Court of Appeals would

give full effect to the mandatory revocation of section 5-07(f)(3) and find that the

J-51 benefits were terminated by force of law upon the Exit Date, precluding any

subsequent application of the RSL.

---

[121]     *See* N.Y.C. Admin. Code §§ 26-504(a)(1)(b), (c).

[122]     In addition, because the J-51 benefits were revoked by force of law
upon a cessation of PHFL regulation, section 5-03(f)(3)(ii) of Title 28 of the
RCNY, which prohibits the termination of rent regulation by revocation or waiver
of J-51 benefits, does not apply.  It was the Owners' withdrawal from the MLP that
terminated rent regulation, not the revocation or waiver of their J-51 benefits.

The undisputed facts of the case support this conclusion. Neither HPD, DOF nor the Owners made an affirmative decision to continue the J-51 tax benefits. On the contrary, the Government does not dispute that the Owners explicitly requested that the buildings be returned "to full taxpaying status."[123] The Government points to no evidence that the Owners intended this letter to mean anything other than a termination of the tax benefits they enjoyed under the MLP and J-51 programs. Therefore, the benefits remained in force solely by mistake. The Government's theory of automatic reversion to the RSL regardless of the Owners' intention would place both the rent regulatory status of apartment units and the tax obligations of building owners, at best, within the unilateral discretion of a single agency head and, at worst, at the mercy of an agency's administrative competence. Given the mandatory language of section 5-07(f)(3), it is doubtful the statutory and regulatory scheme contemplates such a result.

The cases relied upon by the Government are inapposite. As an initial matter, the tenants in *Roberts v. Tishman Speyer Properties, L.P.* challenged the deregulation of their units under the luxury decontrol provisions of the RSL —

---

[123]   IPN Letter to DOF; GG Letter to DOF.

provisions not at issue in this case.[124]  More importantly, the buildings in *Roberts*

had been *subject to the RSL* for two concurrent and independent reasons — receipt

of J-51 tax benefits and section 423 of the RPTL.[125]  As noted above, where a

building is subject to the RSL for two independent reasons, the termination of one

source of rent regulation will not affect the other and, therefore, will not result in a

cessation of rent regulation.[126]  In *Roberts*, no one argued that there had ever been a

cessation of rent regulation.  Accordingly, section 5-07(f)(3) was neither relevant

nor considered.  Here, by contrast, the *single* source of rent regulation, MLP

participation, ended on the Exit Date resulting in the termination of the only form

---

[124]     The question presented in *Roberts* was whether the owners could
deregulate despite receiving J-51 benefits.  The RSL prohibited luxury decontrol
where a building had been subject to the RSL by virtue of receiving J-51 benefits.
The owners argued that the buildings were not subject to the RSL solely by virtue
of the J-51 program because section 432 of the RPTL also subjected their buildings
to RSL regulation.  The New York State Appellate Division held, and the New
York Court of Appeals affirmed, that the luxury decontrol provisions of the RSL
prohibited deregulation regardless of whether J-51 benefits were the sole reason
the building was regulated under the RSL.  *See* 62 A.D.3d 71 (1st Dep't 2009),
*aff'd*, *Roberts v. Tishman Speyer Props., L.P.*, 13 N.Y.3d 270 (2009).

[125]     Section 423 of the RPTL requires buildings withdrawing from Article
V of the PHFL, *see* PHFL § 125, to be subject to the RSL for ten years as tax
benefits are phased out.  *See* RPTL § 423.

[126]     *See* N.Y.C. Admin. Code § 26-504(c).

33

of rent regulation applicable to the buildings — the PHFL.[127]  The question here

(unlike *Roberts*) is whether this termination constituted a cessation of rent

regulation requiring revocation of J-51 tax benefits.[128]

Likewise, the building in *Ade v. Riverview Redevelopment*

*Company*[129] was *subject to the RSL* for two independent reasons — section 2520.11

of the RSC[130] and receipt of J-51 benefits.  Relying on *Roberts*, the *Ade* court held

that continued receipt of J-51 benefits subjected the building to RSL regulation.[131]

However, as in *Roberts*, there was never a cessation of rent regulation.  The

termination of one source of rent regulation would not have affected the other.  For

---

[127]    I reiterate that all parties agree that the Owners were never subject to the RSL prior to the Exit Date.

[128]    *See* N.Y.C. Admin. Code § 26-504.1.

[129]    *See* 896 N.Y.S.2d 800 (Sup. Ct. N.Y. Co. 2010).

[130]    Section 2520.11 of the RSC requires that, upon withdrawal from a federal assistance program, a building constructed prior to 1974 be subject to the RSL.  *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 2520.11.  The building in *Ade* was constructed prior to 1974, regulated under the federal Below Market Interest Rate program, and subsequently withdrew from that program.  *See Ade*, 896 N.Y.S.2d at 802.

[131]    The defendants in *Ade* argued that because they had not yet dissolved under Article V of the PHFL, they were exempt from RSL regulation.  However, the court determined, as a factual matter, that the buildings were not currently subject to regulation under the PHFL and, therefore, not exempt.  *See Ade*, 896 N.Y.S.2d at 804.

this reason, the *Ade* court did not consider section 5-07(f)(3) of the RCNY.

Additionally, the New York Supreme Court decision is neither controlling nor persuasive. The state court held that "upon the termination of a statutory exemption from rent stabilization coverage [under the RSL], the units revert, or become subject, to [RSL] coverage, notwithstanding the lack of an 'express provision' directing coverage [under the RSL] upon termination of the exemption."[132] In support of this proposition, the state court cites *Federal Home Loan Mortgage Corporation v. New York State Division of Housing and Community Renewal*.[133] However, in that case, the building was subject to the RSL *before* qualifying for an exemption from the RSL due to its conversion into a cooperative.[134] Upon returning to rental status, the exemption was terminated and the court held that the building automatically reverted to RSL regulation.[135]

The case does not control the facts here. Neither the J-51 regulations nor the mandatory revocation provision in section 5-07(f)(3) were at issue in that

---

[132]     *Independence Plaza North Tenants' Ass'n*, 907 N.Y.S.2d at 618.

[133]     87 N.Y.2d 325 (1995).

[134]     *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 2520.11(l) (providing that cooperatives are exempt from regulation under the RSL "so long as they maintain [cooperative] status").

[135]     *See Federal Home Loan Mortg. Corp.*, 87 N.Y.2d at 332.

case.  Furthermore, in the instant case the Owners' buildings were never subject to

the RSL prior to deregulation.  Nonetheless, holding that HPD's decision to

terminate J-51 benefits is discretionary, the state court concluded that "as a result

of the receipt of [post-Exit Date J-51] benefits, all dwelling units at IPN became

subject to regulation under the [RSL]."[136]  This reasoning ignores the mandatory

language of section 5-07(f)(3) and is contingent upon the continued receipt of J-51

benefits, to which the Owners were not legally entitled under the regulatory

framework.

### 2.    Vacancy Deregulation

Alternatively, the Government argues that even if the J-51 benefits

were revoked as a matter of law upon the Exit Date, rent regulation under the RSL

extends beyond the revocation or termination of J-51 benefits.  Therefore, HPD's

retroactive termination of the benefits amounted to a revocation which could not,

by law, terminate rent regulation.  The Government bases this argument on two

vacancy deregulation provisions in the statutory and regulatory scheme governing

the J-51 program and the RSL.[137]

*First*, the Government notes that the rules implementing the J-51

---

[136]    *Independence Plaza North Tenants Ass'n*, 907 N.Y.S.2d at 618-19.

[137]    *See* Pl. Mem. at 12-13.

36

program provide that "any building *receiving [J-51] benefits* . . . shall remain subject to rent regulation" until the first vacancy following the termination of benefits unless proper notice of the benefits' expiration was provided in the lease.[138]   However, the legislation that authorized HPD to promulgate this rule, section 489 of the RPTL, is narrower.  It only permits a local law or ordinance to require vacancy deregulation in units that were "subject to rent regulation . . . *as a result of receiving* a [J-51] tax exemption or abatement."[139]   Under this provision, HPD is only authorized to require vacancy deregulation where there was no pre-existing form of rent regulation that qualified the building for J-51 benefits — meaning that the receipt of J-51 benefits was the sole source of rent regulation. Here, the Owners' buildings were subject to rent regulation as a result of the Owners' participation in the MLP, not as a result of receiving J-51 benefits. Accordingly, the J-51 statutory scheme does not require vacancy deregulation.

*Second*, the Government points to the RSL itself.  Subdivision (c) of the RSL states that buildings in receipt of J-51 benefits are subject to RSL regulation.[140]   The following clause of subdivision (c) provides that "[u]pon the

---

[138]    28 RCNY § 5-03(f)(3)(i)(A).

[139]    RPTL § 489(7)(b)(2).

[140]    *See* N.Y.C. Admin. Code § 26-504(c).

37

expiration or termination for any reason of [J-51] benefits . . . *any such dwelling* shall be subject to this chapter until the occurrence of the first vacancy" unless proper notice is given.[141]  Read together, these clauses require that any building in receipt of J-51 benefits to which the RSL applies is subject to vacancy deregulation.  However, these clauses are subject to the exemptions noted in subdivision (a) of the RSL, one of which provides that the RSL is not applicable to buildings or units regulated under the PHFL or any other state law.[142]  Therefore, the vacancy deregulation provision within subdivision (c) only applies to "*any such dwelling*" to which the RSL is applicable and, therefore, it is inapplicable where the building was regulated under the PHFL or any other state law.  This reading is fully consistent with the RSC, which imposes vacancy deregulation only upon post-January 1, 1974 buildings that were "originally made subject to regulation *solely* as a condition of receiving [J-51] tax benefits."[143]  Accordingly, I predict that the New York Court of Appeals would hold that the RSL does not require vacancy deregulation in buildings that were not subject to rent regulation as a result of receiving J-51 benefits.  Because J-51 benefits were not the source of rent

---

[141]     *Id.*

[142]     *See id.* § 26-504(a)(1)(b).

[143]     N.Y. Comp. Codes R. & Regs. tit. 9, § 2520.11(o).

38

regulation in the Owners' buildings, the vacancy deregulation requirements do not apply.

This reading does not leave tenants unprotected upon deregulation. Where a building qualifies for J-51 benefits due to a pre-existing form of rent regulation — and the building is therefore exempt from RSL regulation — the pre-existing form of rent regulation will provide for any protection the legislature believed to be necessary and sufficient before and after deregulation. Here, Title II of the PHFL has its own provisions which establish tenants' rights and landowners' obligations upon withdrawal from the MLP.[144]

### C.   Summary Judgment

The Government has failed to raise any genuine issue of material fact. Though the Government has produced some evidence that the Owners should have been aware of the post-Exit Date withdrawal of J-51 benefits, this factual dispute is immaterial. By law, the Owners were no longer eligible for J-51 benefits after the buildings ceased being regulated under the PHFL and the Government does not contend that the Owners requested or reapplied for J-51 tax benefits at any time following the Exit Date. Because the J-51 benefits were revoked by force of law,

---

[144]   *See* PHFL §§ 32, 32-a, 35; 28 RCNY § 3-17 (requiring that withdrawing company provide notice to tenants and hold public meetings).

the Owners' knowledge of post-Exit Date J-51 benefits has no bearing on the outcome here.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgement is granted in its entirety and the Plaintiff's motion for summary judgment is denied in its entirety.  For the same reasons, Plaintiff's requests for a declaratory judgment and a reformation of the HAP contracts are denied.  The Clerk of the Court is directed to close these motions (in 06 Civ. 7115, Docket Nos. 61, 67; in 06 Civ. 11440, Docket Nos. 57, 63), and these cases.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 10, 2011

- Appearances -

**For the Government:**

Jeffrey Stuart Oestericher
Assistant U.S. Attorney
U.S. Attorney's Office
86 Chambers Street
New York, New York 10007
(212) 637-2200
(212) 292-4573

**For IPN:**

James M. Ringer, Esq.
Meister, Seelig & Fein LLP
708 Third Avenue, 24h Floor
New York, New York 10017
(212) 655-3500

Stephen Bruce Meister, Esq.
Jeanette Renee Blair, Esq.
Stacey Michell Ashby, Esq.
Meister, Seelig & Fein LLP
2 Grand Central Tower
140 East 45th Street, 19th floor
New York, New York 10017
(212) 655-3551
(212) 655-3526

**For Glenn Gardens:**

Peter Curtis Neger, Esq.
Gillian Ivy Epstein, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000